**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No. 1:21-CR-42-HAB |
| | ) | |
| CORTEZ M. LOVE | ) | |

**OPINION AND ORDER**

Defendant pleaded guilty to maintaining a drug-involved premises in January of this year. Now before the Court are the parties' briefs on Defendant's objections to the presentence investigation report. (ECF Nos. 71–73). Defendant argues that the dangerous weapon enhancement under U.S.S.G. § 2D1.1(b)(1) is unconstitutional under the United States Supreme Court's recent decision in *New York Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). He also argues that the Government has failed to carry its evidentiary burden in showing that the enhancement applies to him. Finally, he argues that, even if the enhancement applies, he should still be considered safety valve eligible. An evidentiary hearing was held on the objections in July 2022. The objections are now fully briefed and ripe for ruling.

**I.     Factual and Procedural Background**

Defendant was the target of a drug investigation in early 2020. Wiretaps revealed that Defendant was middling drug deals and manufacturing crack cocaine at his residence. The investigation also included visual surveillance of Defendant's home.

In March 2020, Sergeant Kristin Sprunger ("Sprunger") was conducting surveillance of Defendant's home. She positioned herself a half-block away from Defendant's residence. Sprunger used both a video camera with zoom functionality and binoculars to conduct the surveillance.

Sprunger testified that she observed a meeting between Defendant and one of his drug suppliers inside a vehicle parked in Defendant's driveway. Following what she believed to be a drug transaction, Sprunger observed the supplier pick up an apparent handgun from the center console of the vehicle. The handgun was then handed to Defendant. Sprunger could not give any details about the handgun given her distance from the vehicle. She could not fully view Defendant as he walked from the vehicle back to his home, and she never conducted a closer inspection of the vehicle.

A week and a half after this transaction, officers served a search warrant on Defendant's home. Two firearms were found: a 9mm pistol with an extended magazine and a loaded .22 caliber rifle. Officers also found magazines and ammunition for various firearms not found at the home. In addition, officers found evidence of drug trafficking, including scales, baggies, baking soda, and other materials used to manufacture and store narcotics.

Defendant's son, Cortavius, testified on his father's behalf. Cortavius testified that he owned the firearms found at the home as well as a 9mm handgun. He also claimed that he owned the ammunition found throughout the home. Cortavius, however, was inconsistent regarding where he obtained the firearms or who bought them. His testimony was, on the whole, not particularly credible.

## II.     Legal Discussion

### A.     *U.S.S.G. § 2D1.1(b)(1) is Constitutional*

In *Bruen*, the Supreme Court announced a new test for judging the constitutionality of firearm regulations. The Supreme Court rejected the two-step analysis that had emerged following *District of Colombia v. Heller*, 554 U.S. 570 (2008), calling it "one step too many." *Bruen*, 142 S.

Ct. at 2127. Instead, the Supreme Court announced the following standard for applying the Second Amendment:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id*. at 2129–30 (quotations omitted).

The Supreme Court spent very little time in *Bruen* explaining how to assess whether the Second Amendment's plain text covers an individual's conduct. This, presumably, is because that determination is usually straightforward. Not so, here. The Government argues that, because U.S.S.G. § 2D1.1(b)(1) is an enhancement for a drug crime, it is "not even a gun regulation." (ECF No. 72 at 15). Defendant counters with several arguments, most boiling down to the observation that §2D1.1(b)(1) must be a firearm regulation because it punishes the possession of a firearm. (ECF No. 73 at 3–7).

The Government's argument has some superficial appeal. Section2D1.1 instructs trial courts on how to set a defendant's offense level. The section first sets out different base offense levels depending on the offense and drug amount in section (a), identifies eighteen factors that can increase or decrease the offense level in section (b), and sets forth the drug quantity table in section (c). And, as the Government notes, many factors in section (b) have nothing to do with firearms, instead directing that offense levels be increased for things like distribution inside a prison, bribery, and maintaining a drug-involved premises. Section 2D1.1 is, then, at base a guideline focused on drugs.

But the Government's focus on §2D1.1 as a whole ignores the specific language of (b)(1). That subsection provides, "[i]f a dangerous weapon (including a firearm) was possessed, increase

3

by 2 levels." It is hard to see how this provision, which increases a defendant's base level for possession of a firearm, could be seen as anything but a restriction on "the right of the people to bear Arms." U.S. Const. Amend. II. And the case law bears this out; both before and after *Bruen*, the constitutionality of § 2D1.1(b)(1) has been reviewed under the scope of the Second Amendment. *See United States v. Alaniz*, Case No. 1:21-cr-243-BLW, 2022 WL 3700834 (D. Id. Aug. 26, 2022); *United States v. Greeno*, 679 F.3d 510 (7th Cir. 2012). This Court agrees and finds that the plain text of the Second Amendment covers the conduct at hand.

Now the hard part. *Bruen* instructs that, in determining whether a regulation is "consistent with the Nation's historical tradition of firearm regulation," history is to be the Court's guide.

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Bruen*, 142 S. Ct. at 2131. Stated another way, the goal of the Government in these cases is to identify "historical analogies"; that is, historical American laws that look enough like the contested modern regulation.

It doesn't take long, however, before it becomes clear that a determination the Supreme Court describes as "fairly straightforward" is anything but. *Id*. For instance, in identifying a historical regulation on which to hang its hat, the Government need only identify a "historical *analogue*, not a historical *twin*." *Id*. at 2133. But even a historical twin may not be enough, because upholding every modern regulation with a historical analogue "risks endorsing outliers that our ancestors would never have accepted." *Id*. (quotation omitted). So, it would seem, identifying an

analogue is a necessary, but not a sufficient, condition to finding a modern regulation constitutional.

That's to say nothing of making sure your analogue is appropriately "historic." "Not all history is created equal," *Bruen* instructs. *Id*. at 2136. "Historical evidence that long predates either [the adoption of the Second or Fourteenth Amendments] may not illuminate the scope of the right." *Id*. At the same time, "we must also guard against giving postenactment history more weight than it can rightly bear." *Id*. Reviewing courts, then, must find the goldilocks of historical analogues: not too old, not too new, but just right.[1]

And how many analogues are necessary? While some of the language in *Bruen* suggests the answer is one—the Supreme Court repeatedly uses the singular "analogue" when discussing the required evidence—at other times the Supreme Court suggests two or even three historical analogues are not enough. *Id*. at 2142 ("we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulations") (original emphasis); 2153 ("but the Texas statute, and the rationales set forth in *English* and *Duke*, are outliers"). Each district court must determine whether the proposed analogues are analogue-enough, or if they require the presence of the analogue cavalry to carry the day.

But we're not finished. A district court must seemingly consider *where*, along with *when* and *how many*, when reviewing proposed historical analogues. *Bruen* recognized the existence of widespread prohibitions against the carrying of firearms in 19th century Arizona, New Mexico, Wyoming, Idaho, and Oklahoma, but brushed those prohibitions aside by characterizing them as

---

[1] Justice Barrett's concurrence highlights the difficulties in choosing what historical evidence is relevant to modern firearm regulations. She raises what she sees as two unanswered questions: (1) "the manner and circumstances in which postratification practice may bear on the original meaning of the Constitution"; and (2) whether the appropriate goldilocks timeframe is the adoption of the Second Amendment, 1791, or the adoption of the Fourteenth Amendment, 1868. *Id*. at 2162–63 (Barrett, J. concurring).

"territorial legislative improvisations." *Id*. at 2154. So examples from the original thirteen colonies are probably okay, from the wild west not so much, and from states in the middle a giant shrug.

Given all these uncertainties, one could rightfully ask why district courts are being tasked with making piecemeal determinations on each firearm law in the first place. *Bruen* is clear that the Second Amendment "codified a right inherited from our English ancestors," a right that "*pre-exist[ed]*" the Constitution. *Id*. at 2130, 2139 (original emphasis). The entire universe of permissible firearm regulations, then, was set at the adoption of the Bill of Rights, if not earlier. *Bruen* could have delineated regulations that fall within that universe and those that do not. By instead announcing an inconsistent and amorphous standard, the Supreme Court has created mountains of work for district courts that must now deal with *Bruen*-related arguments in nearly every criminal case in which a firearm is found.

Thankfully, the problems with *Bruen*'s game of historical Where's Waldo are academic here. *Bruen* is rife with historical observations that would exclude from Second Amendment protections individuals that carry firearms to facilitate crime. *Id*. at 2145 (observing that colonial firearm laws "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people"); 2150 ("[u]nder the common law, individuals could not carry deadly weapons in a manner likely to terrorize others"); 2152 (citing an 1866 South Carolina law providing "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms"); 2156 (noting that reasonable, well-defined restrictions on firearm possession include those that limit "the intent for which one could carry arms"); 2162 ("nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons and the mentally ill") (quoting *Heller*, 554 U.S. at 626–27). And, as the Government's supplemental authority notes, "the people" whose right to bear arms is protected by the Second Amendment are the "law-abiding," responsible

citizens, not those who would violate the nation's laws. *Range v. Attorney Gen. U.S.*, --- F.4th ---, 2022 WL 16955670, at *15 (3d Cir. Nov. 16, 2022). Section 2D1.1(b)(1) punishes firearm possession only when it occurs in relation to a federal drug offense. Definitionally, then, it applies only to those who are actively violating the nation's drug laws. The guideline falls well-within this nation's historical limitations of gun ownership and passes constitutional muster.[2]

**B.      *The Government has Established the Applicability of the Enhancement***

Defendant next argues that, even if § 2D1.1(b)(1) is constitutional, the Government has failed to prove it applies here. The application note to subsection (b)(1) states, in part:

> The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet.

U.S.S.G. § 2D1.1, cmt. n. 11. The Seventh Circuit has construed this provision to require the Government to prove by a preponderance of evidence that the defendant possessed a weapon. *United States v. Orozco*, 576 F.3d 745, 751 (7th Cir. 2009)[3]. The government can satisfy its burden by showing either actual possession or constructive possession, meaning "the defendant had the power and the intention to exercise dominion or control of the firearm." *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005). If the government meets its burden, the defendant must show

---

[2] The Court concedes Defendant's point that the Government has not pointed to a specific historical analogue to §2D1.1(b)(1), instead relying on case law citations where other courts have reviewed the historical record. (*See* ECF No. 73 at 8). The Court views Defendant's argument as requiring little more than busy work at best, or plagiarism at worst. When other courts have set forth a laundry list of historical statutes, there is little utility in forcing the Government to reproduce that discussion rather than citing to it. To require otherwise would deviate from legal briefing as it has existed since time immemorial.

[3] Because the Seventh Circuit interprets the guideline section and the application note to require possession, rather than simply presence, Defendant's arguments about the breadth of the application note are non-starters. Even if the Court credits the argument that the comment note sweeps more conduct into the guideline section than the language of §2D1.1(b)(1) itself, the interpretations binding on the Court limit themselves to the plain language of § 2D1.1(b)(1). The Court will therefore do the same.

that it's clearly improbable he possessed the weapon in connection with the drug offense. *Orozco*, 576 F.3d at 751.

Defendant focuses on the fact that his son claimed ownership of the gun, but the Government is correct that possession, rather than ownership, is the issue. As for possession, the Mossburg rifle was found in the closet of Defendant's bedroom. Whether he owned it or not, the presence of a gun in the room where Defendant slept is enough to show possession. *United States v. Morris*, 836 F.3d 868, 872 (7th Cir. 2016). And even if the son's testimony is credited, ownership by a family member is not enough to defeat possession where Defendant has knowledge of, and access to, the weapons. *United States v. Corcimiglia*, 967 F.2d 724, 726–27 (1st Cir. 1992). The Court has no problem finding, by a preponderance of the evidence, that Defendant either actually or constructively possessed the firearms.

Because the Government has established possession, it is now Defendant's burden to show that it is clearly improbable that the firearm was connected to his offense of conviction. *Morris*, 836 F.3d at 873. This means that Defendant must show not only that it was improbable that the guns were connected to his maintaining a drug-involved premises, but "also that the improbability is apparent to those assessing the factual situation." *United States v. Idowu*, 520 F.3d 790, 796 (7th Cir. 2008).

Or does he? Defendant's primary argument is that he should not have any burden, and that imposing a burden on him is "inimical" to the nation's history of firearms regulation and the plain text of § 2D1.1(b)(1). The Court rejects these arguments.

First, there is nothing exceptional about the defendant carrying a burden in a criminal case. There are any number of examples in which the defendant carries, at the very least, a prima facie burden of proof. *See Batson v. Kentucky*, 476 U.S. 79, 96 (1986) (defendant must make prima facie

showing of purposeful discrimination in the selection of a jury); *Patterson v. New York*, 432 U.S. 197, 206 (1977) (approving statute imposing a preponderance of the evidence burden on defendant to maintain the affirmative defense of extreme emotional disturbance); *United States v. Jumah*, 493 F.3d 868, 875 (7th Cir. 2007) ("At common law, the burden of proof for all affirmative defenses of justification and excuse rests on the defendant."). That the comment places a burden of proof on Defendant is unremarkable and is not a barrier to the imposition of § 2D1.1(b)(1).

Second, there is nothing about imposing a burden of proof on Defendant that contravenes this nation's history and tradition of firearms regulation. Citing *Bruen*, Defendant argues that the only burden at issue in any firearms case is the Government's burden to show that the contested regulation reflects the nation's historical tradition. (ECF No. 73 at 3). But *Bruen* has no applicability at this stage. *Bruen* is directed solely at determining whether a firearm regulation is constitutional. We are at the stage when the Court must apply a constitutional regulation. *Bruen* does not inform the Court's decision.

Finally, if the comment conflicts with the text of § 2D1.1(b)(1), it is for Defendant's benefit. The Guideline leaves no defense "[i]f a dangerous weapon (including a firearm) was possessed," it simply directs the Court to add two levels to the base offense level. U.S.S.G. § 2D1.1(b)(1). Ignoring the "clearly improbable" language from the comment does not leave Defendant with a lessened burden, nor does it place a burden on the Government. Instead, it would simply remove any defense for an offender found in possession of a firearm in connection with a drug crime.[4] This cannot be the outcome that Defendant wants.

That Defendant is willing to die on the hill of a legal challenge to the comment is a clear recognition that he does not have the evidence to rebut the application of the enhancement here.

---

[4] Defendant admits as much in his reply brief, calling the guideline "singularly possession oriented." (ECF No. 73 at 8).

9

Defendant's primary defense appears to be that he was not dealing out of his residence but simply using drugs. He repeatedly notes the lack of cocaine in the home and the user amounts of marijuana. (*See* ECF No. 71 at 10). But as the Government correctly notes, Defendant pleaded guilty to distributing and manufacturing crack cocaine at his residence from January through March 2020. Given that admission, Defendant will not now be heard to argue that he was a small-time drug user.

When the facts are viewed in a light consistent with Defendant's admitted conduct in his plea, there is no basis to conclude that it was "clearly improbable" that the firearms found in Defendant's home were connected to his drug activities. There is no evidence that Defendant was a hunter, sport shooter, or had any other innocent use for the firearms. *See United States v. Fincher*, 929 F.3d 501, 506 (7th Cir. 2019) (noting, in rejecting the defendant's arguments against the application of the enhancement, that "the handgun was not a hunting gun, so the type of firearm did not suggest it had a purpose unrelated to the offense"). The firearms were not so far from the drug evidence that a clearly improbable finding flows. *United States v. Adams*, 125 F.3d 586, 597 (7th Cir. 1997) ("guns found in close proximity to illegal drugs are presumptively considered to have been used in connection with the drug trafficking enterprise"). And this is without even going into Sprunger's testimony that Defendant possessed a firearm during a suspected drug deal. Defendant has failed to carry his burden and the Court finds that the enhancement under U.S.S.G. § 2D1.1(b)(1) applies.

**C.    *Defendant is Ineligible for the Safety Valve***

Finally, Defendant claims that, even if the enhancement applies, he is still eligible for the safety valve under 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2. The appropriate analysis for this

10

claim comes from *United States v. Stamps*, 983 F.3d 945 (7th Cir. 2020). There, the Seventh Circuit wrote:

> Once the government proves his possession of the firearm, the burden then shifts to [Defendant] under both the safety valve and § 2D1.1(b)(1), but the burden of proof is different and distinct for each section. In *United States v. Fincher*, 929 F.3d 501 (7th Cir. 2019), we explained that for safety-valve eligibility, the defendant needs to prove only by a preponderance of evidence that he did not possess the gun in connection with his offense. *Fincher*, 929 F.3d at 505. To challenge a § 2D1.1(b)(1) enhancement, however, the defendant must show that it was "clearly improbable" that he possessed the gun in connection his offense. *Id*.

*Id*. at 949. Defendant seizes upon this lower evidentiary standard to again argue that the firearms found in his home were not connected to his crime of conviction.

The Court recognizes the lower hurdle that Defendant must clear for safety valve eligibility, but it cannot reach a different conclusion about Defendant's nefarious use of the firearms. Consider the mitigating evidence in *Stamps*.

> Stamps provided a non-drug related reason for owning the gun—he wanted to be able to protect himself after he was wrongfully accused of murder. The district court found him credible, and other evidence in the record corroborated his story. Stamps, for example, bought the gun after being implicated in the murder, though he had already been selling drugs for a couple of years at that point. Stamps also argued that he conducted all of his drug deals outside of his home, none of his customers knew where he lived, and he never carried the gun with him to drug transactions. In addition, in contrast to *Fincher*, the firearm was located in a different room than the drugs.

*Id*. at 950. Defendant has not offered an innocent explanation for his possession of the firearm. True, he claims that he did not own them, but that evidence is not only irrelevant to possession, but it was also less-than credible. Defendant did not conduct his drug activities outside his home; he has pleaded guilty to maintaining his home as a drug-involved premises. One of the firearms was found in a bag in the living room, a room directly next to the kitchen where most of the drug evidence was found. The Court finds no credible reason for the possession of the firearms other

than Defendant's drug activity, and therefore finds that Defendant is not eligible for the safety valve.

## III.    Conclusion

For these reasons, Defendant's objections to the presentence investigation report (ECF No. 48) are OVERRULED.

SO ORDERED on December 20, 2022.

 s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT